# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| SANDRA K. MOORE, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    CAUSE NO. 1:14-cv-00160-SLC |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, sued as Carolyn W. | ) |
| Colvin, Acting Commissioner of SSA, | ) |
| | ) |
|     Defendant. | ) |

## OPINION AND ORDER

Plaintiff Sandra K. Moore appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Moore applied for DIB and SSI on or about June 2011, alleging disability as of June 1, 2003 (DE 10 Administrative Record ("AR") 177-85); she later amended her alleged onset date to February 4, 2009 (AR 24, 194). Her DIB-insured status expired on September 30, 2011 (AR 196), so with respect to her DIB application, she must show that she was disabled on or before that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

---

[1] All parties have consented to the Magistrate Judge. (DE 14); *see* 28 U.S.C. § 636(c).

The Commissioner denied Moore's application initially and upon reconsideration. (AR 94-113). After a timely request, a hearing was held on September 13, 2012, before Administrative Law Judge Julia Gibbs ("the ALJ"), at which Moore, who was represented by counsel, and a vocational expert ("VE") testified. (AR 48-93). On October 22, 2012, the ALJ rendered an unfavorable decision to Moore, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of unskilled, light work jobs in the economy, including cashier, packer, and machine feeder. (AR 24-38). The Appeals Council denied her request for review (AR 1-7), at which point the ALJ's decision became the final decision of the Commissioner. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994); 20 C.F.R. §§ 404.981, 416.1481.

Moore filed a complaint with this Court on May 28, 2014, seeking relief from the Commissioner's final decision. (DE 1). Moore argues that the ALJ: (1) failed to adequately account for her moderate difficulties in both maintaining concentration, persistence, or pace, and maintaining social functioning when assigning residual functional capacity ("RFC") and when posing hypotheticals to the VE; (2) improperly evaluated the credibility of her symptom testimony; and (3) failed to properly weigh the medical source opinion evidence. (DE 19 at 4-10).

## II.  FACTUAL BACKGROUND[2]

### *A. Background*

At the time of the ALJ's decision, Moore was 43 years old (AR 19, 94); had a high school education (AR 200); and had past work experience as a foster parent and a service

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 809-page administrative record necessary to the decision.

technician at an optical store (AR 36, 200, 208).  She alleges disability due to depression, anxiety, post traumatic stress disorder ("PTSD"), panic attacks, scoliosis, and intermittent renal failure.  (DE 19 at 2).

### B.  Moore's Testimony at the Hearing

At the hearing, Moore testified that she is divorced and has five children, two biological and three adopted (AR 55, 68, 329); only one child, who is 12 years old, lived with her at the time (AR 62-63).  Moore has a fiancé, who resides separately.  (AR 64, 66).  Moore had worked as a foster parent from 1995 to 2009; she stopped doing so after her divorce.  (DE 55-56, 63).

Moore stays in bed most of the day until her daughter comes home from school, stating that she "feels safer" there.  (AR 62, 65).  She finds it difficult to leave her home by herself; she always has someone with her when she shops or goes to appointments so that she can "feel safe."  (AR 63-65).  Once a week she has a "good day," and performs household chores such as cooking and cleaning (AR 65); her fiancé or her mother manage her finances (AR 66-67).

Moore stated that at the time of her divorce, she started having "real bad flashbacks" from her childhood.  (AR 58, 70).  She complained that she frequently loses concentration, is irritable, and feels extremely tired all of the time.  (AR 58-60).  She attributed her irritability to both her  her mood and her physical pain.  (AR 60).  She stated that she becomes tearful at least four to 11 times a day and that it takes her 20 minutes to compose herself after each episode; often she simply cries all day.  (AR 60-61).  She said that she sleeps only two to three hours a night and then naps during the day (AR 61); she thought her daytime fatigue was related to both her mental impairments and her lack of sleep (AR 77).

Moore also complained of having migraine headaches and pain in her neck, left shoulder,

and back, explaining that she had worn a back brace as a child due to scoliosis (AR 59, 72-75); she started taking Vicodin for her back pain in 2008 (AR 76-77). She complained of problems with sitting and walking, estimating that she could stand for just five to 10 minutes before needing to sit. (AR 78). She thought that she could alternately sit, stand, or walk for an hour before needing to lie down, and that she could sit, stand, or walk for just two hours in an eight-hour period; she could lift five pounds. (AR 79-80, 86-87).

*C. Summary of the Relevant Medical Evidence*

In February 2003, Moore was hospitalized for complaints of sleep problems, racing thoughts, suicidal ideation, low energy, fatigue, decreased concentration, guilt, flashbacks, nightmares, panic attacks, and tearfulness. (AR 329-47). Upon admission, her Global Assessment of Functioning ("GAF") score was 20, but four days later upon discharge, it was 55 to 60.[3] (AR 331, 347). She was diagnosed with major depression, severe, recurrent; and a rule-out PTSD. (AR 347).

From 2003 to 2009, Moore was treated for a variety of physical complaints, including

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Revision, 4th ed. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). *Id*. A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

"The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the medical sources of record used GAF scores in assessing Moore, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

4

chest pain, acute renal failure, recurrent hematuria, acute cystitis, pelvic pain, and headaches; she had a tubal ligation, a hysterectomy, and removal of her gall bladder. (AR 280-87, 300, 382-83, 402-03, 411-35, 462-81, 532-34, 548-53, 559-60). She was noted to have marked dextroscoliosis in the thoracic and lumbar spine. (AR 418, 581-82). Cardiac testing for her chest pain ruled out abnormalities, and her symptoms were attributed to anxiety. (AR 373-74, 380-82, 389-92, 447).

In March 2009, Moore was hospitalized due to stress, stating that she had recently gone through a divorce from her husband of 20 years, had moved homes, and had one of her ex-husband's friends stalking her. (AR 353). She reported symptoms of poor sleep and appetite; tearfulness; weight gain; feelings of hopelessness, helplessness, and worthlessness; poor energy, memory, and concentration; suicidal ideation; anxiety attacks with chest pain, shortness of breath, and palpitations; nausea; tension; sweating; and fear of leaving her home. (AR 353). On admission, she was assigned a GAF of 30 and diagnoses of recurrent and severe major depressive disorder, not psychotic; PTSD; and panic attacks with agoraphobia. (AR 355). After six days, she was discharged with a GAF of 50. (AR 361).

In July 2009, a nurse practitioner at Jay Community Health Partners, Moore's primary health care provider for five years, wrote a letter stating that Moore had not been able to work recently due to personal reasons, but was released to work without restrictions on June 30, 2009. (AR 535).

In March 2010, Moore was seen by a nurse practitioner at Central Indiana Orthopedics for a six-month history of left shoulder pain. (AR 556). Moore had diffuse pain and tenderness throughout her left shoulder area, decreased range of motion, a positive impingement test, and

5

weakness in all planes. (AR 556-57). She was diagnosed with a cervical neck strain and left shoulder impingement, weakness, and large dystrophic calcification. (AR 557). She received treatment, including an injection and physical therapy. (AR 554-55, 596-98). Within a month, Moore's neck and shoulder symptoms improved, except that she still had diffuse pain throughout her shoulder. (AR 554, 596).

In May 2011, Moore told a nurse practitioner at Central Indiana Orthopedics that she had not followed up on her shoulder pain because she was depressed. (AR 545). She was referred to physical therapy, but stopped going after three visits, stating that it worsened her shoulder pain and caused numbness in her hands. (AR 590). In June and July 2011, Moore complained of pain in "all areas," diffuse tenderness, and numbness and tingling in her hands and feet. (AR 587). The nurse practitioner's impression was mild cervical degenerative disc disease and myofascial pain, possible fibromyalgia. (AR 588).

On July 21, 2011, Dr. H.M. Bacchus, Jr., evaluated Moore at the request of the state agency. (AR 613-15). Moore had trigger point tenderness throughout her back and tenderness to palpation and range of motion of her back and left shoulder; her gait was slower in nature. (AR 614). She had decreased range of motion in her low back, neck, knees, hips, and left shoulder; decreased strength in her left upper extremity; and decreased grip strength bilaterally. (AR 614). She demonstrated a fine tremor bilaterally, and fine and gross dexterity were slowed; neurological signs were normal, other than some hypersensitivity in her back. (AR 614). She appeared mildly depressed, and her affect was flat. (AR 614). Dr. Bacchus's impression was chronic low back pain from scoliosis, cervical pain with possible radiculopathy, a possible disc protrusion at C4-5 and C5-6, a history of kidney disease/stones and irritable bowel syndrome,

6

depression and anxiety, left shoulder calcification and rotator cuff tear, and possible fibromyalgia pending evaluation. (AR 615). He opined that Moore retained the functional capacity to perform at least light duties, with limited bending, twisting, turning, and climbing; he indicated that she may also have difficulty with repetitive pushing, pulling, and overhead work involving her left upper extremity. (AR 615).

On July 25, 2011, Moore underwent a mental status examination by F. Renee Vaux, Ph.D. (AR 618-22). Dr. Vaux stated that Moore was cooperative, but tearful and timid at times; psychomotor agitation was observed. (AR 619). Moore's mood was depressed, and her affect restricted; her thought processes were logical, and her behavior goal oriented. (AR 619). When asked whether Moore could attend to a simple, repetitive task continuously for a two-hour period, Dr. Vaux responded that Moore exhibited deficits in memory and sustained attention, which could impact her ability to attend to repetitive activities for extended periods. (AR 621). She also opined that Moore's work pace may be slowed due to deficits in memory and attention, low energy, and depression; she indicated that Moore may require increased supervision and accommodations. (AR 621). Dr. Vaux noted that Moore reported largely intact adaptive functioning, which was at times affected by poor motivation. (AR 622). Dr. Vaux assigned Moore a GAF of 49 and diagnoses of major depressive disorder, recurrent, moderate; generalized anxiety disorder; rule-out PTSD; and rule-out personality disorder, not otherwise specified, with dependent and borderline features. (AR 622).

On July 27, 2011, Dr. M. Brill, a state agency physician, reviewed Moore's record and found that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally

7

climb, balance, and reach overhead with the left upper extremity. (AR 623-30). This opinion was later affirmed by a second state agency physician. (AR 656).

That same day, Moore was evaluated for fibromyalgia by a nurse practitioner at Medical Consultants, PC. (AR 635-36). Moore reported fatigue, sleep problems, back pain, joint pain, myalgias, weakness in her arms and legs, frequent headaches, numbness and tingling, heat intolerance, increased sweating, and memory problems. (AR 635). The nurse practitioner found that Moore had widespread tender point areas in the pattern of fibromyalgia, and the nurse practitioner's clinical impression was "[v]ery definitely fibromyalgia." (AR 636). She recommended that Moore try moist heat, stretching, and muscle rubs; prescribed Lyrica; and encouraged Moore to continue physical therapy. (AR 636).

On August 22, 2011, B. Randal Horton, Psy.D., a state agency psychologist, reviewed Moore's record, and completed psychiatric review technique and mental RFC forms. (AR 637-39). On the psychiatric review technique, Dr. Horton found that Moore had moderate restrictions in daily living activities, and moderate difficulties in both maintaining social functioning and maintaining concentration, persistence, or pace. (AR 651). On a mental RFC assessment form, Dr. Horton indicated that Moore had moderate limitations in the following mental activities: understanding, remembering, and carrying out detailed instructions; completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and interacting with the general public. (AR 637-39). She was not significantly limited in the remaining 16 mental activities. (AR 637-39). In her narrative, Dr. Horton concluded that Moore had the ability to perform unskilled work. (AR 639). This opinion was

8

later affirmed by a second state agency psychologist, Benetta Johnson, Ph.D. (AR 655).

In October 2011, Moore underwent a psychological intake evaluation by Teresa McDaniel, LMHC, Ph.D., and William Roll, Ph.D., at Centerstone.[4] (AR 693-709). She was assigned a GAF of 48 and diagnoses of major depressive disorder, recurrent, moderate; dysthymic disorder, early onset, without atypical features; and PTSD, chronic. (AR 694).

In February and April 2012, Moore presented with an anxious or dysphoric mood, fair insight, fair to good judgment, and logical and sequential thought processes. (AR 691). By May, Moore reported that she was much improved from starting on Cymbalta and Trazodone, with better sleep, less fibromyalgic pain, and more energy. (AR 779). Her mood was euthymic, and her affect appropriate and full. (AR 779). In June, however, her mood was depressed and tearful, reporting that an incident with her ex-husband's new wife triggered some fears and anxiety. (AR 778). In August, Moore stated that she could not increase her dosage of Cymbalta without increasing her anxiety and nausea; she was instructed to split up the dose to twice daily. (AR 776).

In August 2012, Dr. McDaniel completed a medical source statement on Moore's behalf, listing diagnoses of chronic PTSD, moderate to severe major depressive disorder, and early onset dysthymic disorder. (AR 780-84). She indicated that Moore had difficulty leaving home due to anxiety and depression; problems being around others, including the general public, supervisors, and coworkers; and that her depression was characterized by chronic depressive symptoms with recurrent major depressive episodes lasting several weeks. (AR 780-84). Dr. McDaniel

---

[4] Although Ms. McDaniel's electronic signature on certain treatment notes reflect that she is a licensed mental health worker (*see, e.g.*, AR 699), her medical source statement reveals that she is also a psychologist (AR 784).

9

concluded that Moore's symptoms would cause her to be absent or tardy from work; interfere with her ability to concentrate on work tasks; and interfere with her ability to interact with the general public, supervisors, and coworkers. (AR 780-84).

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On October 22, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 24-38). The ALJ noted at step one of the five-step analysis that Moore had not engaged in substantial gainful activity since her amended alleged onset date of February 4, 2009. (AR 27). At step two, the ALJ found that Moore had the following severe impairments: recurrence of kidney stones, irritable bowel syndrome, tendonitis of the left shoulder, partial rotator cuff tear of the left shoulder, cervicalgia, cervical disc protrusions, depression, anxiety disorder with panic attacks, and PTSD. (AR 27). At step three, however, the ALJ concluded that Moore did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 28).

Before proceeding to step four, the ALJ determined that Moore's symptom testimony was not credible to the extent it was inconsistent with the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is further restricted to unskilled work that can be easily learned by short demonstration, does not require working alone, does not require interaction with the general public, does not require overhead reaching with the left arm, and does not require climbing.

(AR 30).

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Moore was unable to perform her past relevant work. (AR 36). The ALJ then concluded at step five that Moore could perform a significant number of unskilled, light jobs within the economy, including cashier, packer, and machine feeder. (AR 37). Therefore, Moore's claims for DIB and SSI were denied. (AR 38).

12

### C. The Mental RFC Assigned by the ALJ and Her Consideration of Dr. McDaniel's Opinion Will Be Remanded

Moore argues that the ALJ failed to adequately account in the mental RFC and step-five hypothetical for her finding that Moore had moderate deficiencies in both maintaining concentration, persistence, or pace, and maintaining social functioning. (AR 29). She also argues that the ALJ failed to properly consider the opinion of Dr. McDaniel, her treating psychologist, stating that she has significant difficulty being around others, including supervisors and coworkers, which contributes to her concentration problems. (AR 781-83).

As explained earlier, "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). "The RFC assessment must be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Cases from the Seventh Circuit Court of Appeals "generally have required the ALJ to orient the VE to the totality of a claimant's limitations." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (citations omitted). "[The] cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *Id.*

More specifically, in *O'Connor-Spinner*, the Seventh Circuit concluded that the ALJ erred where he found that the claimant had moderate difficulties in concentration, persistence, or pace, but failed to specifically observe this limitation when posing hypotheticals to the VE at step five. 627 F.3d at 620-21. In doing so, the court acknowledged that it has not insisted "on a per se requirement that this specific terminology ('concentration, persistence, or pace') be used in the hypothetical in all cases." *Id.* at 619. The court explained:

> We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence, or pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. We most often have done so when a claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work.

627 F.3d at 619 (citing *Arnold v. Barnhart*, 473 F.3d 816, 820 (7th Cir. 2007) (upholding a hypothetical restricting the claimant to work involving low production standards and a low-stress environment, where the claimant's difficulties with concentration, persistence, or pace arose from stress-induced headaches, frustration, and anger); *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (allowing a hypothetical formulated in terms of "repetitive, low-stress" work to stand, where the claimant's deficits in concentration, persistence, or pace stemmed from a panic disorder); *Sims v. Barnhart*, 309 F.3d 424, 427, 431-32 (7th Cir. 2002) (finding that the ALJ's restricting the claimant from jobs "involving complex work processes or unusual levels of stress" adequately accommodated the claimant's concentration problems arising, in part, from a panic disorder)).

"In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." *Id.* at 620 (finding that a restriction to repetitive tasks with simple instructions did not necessarily account for the claimant's depression-related problems in concentration, persistence, and pace) (collecting cases); *see also Warren v. Colvin*, 565 F. App'x 540, 544 (7th Cir. 2014) (finding that a limitation to "simple, repetitive tasks" did not adequately account for the claimant's concentration problems arising from depression and borderline intellectual functioning); *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014) (concluding that a limitation to unskilled work did not sufficiently account for the

14

claimant's concentration problems stemming from depression and a psychotic disorder). "The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity." *O'Connor-Spinner*, 627 F.3d at 620 (citing *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677 (7th Cir. 2008); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); SSR 85-15, 1985 WL 56857, at *6 (1985)).

"Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job." SSR 85-15, 1985 WL 56857, at *6 ("The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs."). Accordingly, the RFC and hypotheticals "must account for *both* the complexity of the tasks and the claimant's ability to stick with a task over a sustained period." *Warren*, 565 F. App'x at 544 (emphasis added) (citations omitted); *see Yurt*, 758 F.3d at 858 (articulating that an RFC for unskilled work "by itself does not provide any information about [the claimant's] mental condition or abilities").

Here, the ALJ concluded that Moore had moderate limitations in concentration, persistence, or pace (AR 29), but the ALJ did not expressly include this limitation in the RFC and the hypothetical to the VE (AR 30). Instead, the ALJ posed a hypothetical to the VE limiting Moore, in relevant part, to "unskilled or low level semi-skilled work, so there's less

15

stress, a job that could be learned easily with a demonstration." (AR 89-90).

Moore's concentration problems are both depression- and anxiety-related. Thus, this case falls somewhere on the spectrum between *Johansen*, where the claimant's concentration problems stemmed from a panic disorder and a hypothetical for "low-stress, repetitive" work was found adequate, 314 F.3d at 289, and *O'Connor-Spinner*, where the claimant's concentration problems were depression-related and a hypothetical for "repetitive tasks with simple instructions" was found inadequate, 627 F.3d at 620. As a result, whether the ALJ's hypothetical was sufficient to account for Moore's problems in concentration, persistence, or pace is a close call. *See Kendzion v. Colvin*, No. 13 C 4820, 2014 WL 5448670, at *5 (N.D. Ill. Oct. 2, 2014) (describing the Seventh Circuit's "line" between whether an ALJ's hypothetical adequately accounts for deficits in concentration, persistence, or pace, as "a gray one, to say the least"). "Ideally, the ALJ would have included the concentration difficulties in both [her] hypothetical to the VE and [her] RFC. That's the preferred, fool-proof method." *Gomez v. Colvin*, 73 F. Supp. 3d 921, 931 (N.D. Ill. 2014) (citing *O'Connor-Spinner*, 627 F.3d at 619).

The Commissioner acknowledges that the ALJ did not include Moore's concentration difficulties in the RFC or th hypotheticals posed to the VE, but urges that the ALJ reasonably relied upon the opinion of Dr. Horton (affirmed by Dr. Johnson), who in the narrative section of the opinion purportedly "translated" Moore's moderate difficulties in maintaining concentration, persistence, or pace into an RFC for unskilled work. *Johansen*, 314 F.3d at 289. But Dr. Horton's narrative "provides no insight about how or why [Moore's] mental impairments affect [her] attention, concentration, or pace." *Pearson v. Colvin*, No. 4:13-cv-00035-SEB-DML, 2014 WL 4352168, at *4 (S.D. Ind. Aug. 27, 2014). Thus, there is no explanation why Moore's

16

difficulties with concentration, persistence, or pace would not interfere with the performance of competitive work. *See id.*; *see also Yurt*, 758 F.3d at 858-59 ("[W]e have repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.") (collecting cases).

The social limitations assigned by the ALJ in the RFC are also relevant to Moore's problems with concentration, persistence, or pace. The ALJ limited Moore to work that "does not require working alone [and] does not require interaction with the general public." (AR 30). As a general premise, "[t]he ability to function in social settings and navigate workplace social interactions is very different from the ability to concentrate on individual work with a certain degree of success and productivity, and accounting for a limitation in the former area does not necessarily alleviate difficulties in the latter area." *Ittel v. Astrue*, No. 2:12-CV-096 JD, 2013 WL 704661, at *14 (N.D. Ind. Feb. 26, 2013); *see, e.g.*, *Yurt*, 758 F.3d at 859 ("[A]lthough the ALJ's hypothetical contained several limitations accounting for [the claimant's] difficulties in social functioning, the blanket statement that he could perform 'unskilled' work fails to accurately capture [the claimant's] documented difficulties with concentration, persistence, and pace."). However, in cases where a claimant's concentration problems are triggered by being around others, a social limitation has been found to adequately account, at least in part, for the claimant's concentration deficits. *See, e.g.*, *Capman v. Colvin*, — F. App'x —, 2015 WL 3982131, at *4 (7th Cir. July 1, 2015) (finding that where a claimant's anxiety attacks occur when he is around people, an RFC limiting the claimant to "simple, routine tasks and limited interactions with others" sufficiently accounted for a claimant's problems in concentration,

persistence, or pace).

In this instance, there is a significant amount of evidence that Moore's symptoms increase when she has to leave her home and be around others, which then contributes to her difficulties with concentration, persistence, or pace. (*See, e.g.*, AR 60, 62-65, 86, 237-38, 261, 264-65, 781). Both Dr. Horton and Dr. McDaniel agree that Moore would have problems dealing with the general public, and the ALJ included this limitation in the RFC. Dr. McDaniel, however, opined that Moore would *also* have difficulty dealing with supervisors and fellow employees. Specifically, Dr. McDaniel wrote that "[t]rauma issues make it difficult for [for Moore] to be around others" and that her depressive symptoms and low self esteem "cause a lot of difficulty dealing with employees and/or most people." (AR 783). Dr. McDaniel added that Moore's self esteem is so poor that she would have "a great deal of problems with even constructive criticism." (AR 783).

The ALJ did not adequately confront and resolve the conflict between Dr. McDaniel's and Dr. Horton's opinions on this point. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (stating that an ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability" (citation omitted)). Instead, the ALJ attempted to accommodate some of Moore's symptoms by restricting her from working alone; the ALJ's logic on this point, however, is difficult to follow. *See Clifford*, 227 F.3d at 872 (The ALJ "must build an accurate and logical bridge from the evidence to his conclusions." (citations omitted)); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that the ALJ's decision must demonstrate the

path of her reasoning, and the evidence must lead logically to her conclusion)*.

Moore stated that in order to "feel safe" (AR 63), she typically does not leave her home without someone with her—usually her daughter, mother, father, or fiancé (*see, e.g.*, AR 60, 62-65, 86, 238, 261, 263-65). From this, the ALJ ostensibly reasoned that Moore's symptoms are triggered from being alone, and thus, that her supervisors and coworkers would somehow make her "feel safe." But the evidence of record reveals that Moore's symptoms *increase* when she is around other people; therefore, the restriction from working alone does not effectively address this evidence. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must sufficiently articulate her assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced).

Perhaps the ALJ's logic in restricting Moore from working alone would be more evident if the hearing transcript were complete. But the hearing transcript reflects a 15-minute gap in audio during what seems to be the ALJ's questioning of Moore about her mental health symptoms. (*See* AR 57). Therefore, the Court is left to only speculate about Moore's testimony during that gap. "The court has the authority to remand a case for further consideration if it is unable to exercise meaningful or informed judicial review because of an inadequate administrative record." *Edwards v. Astrue*, No. 09-2120-CM-GBC, 2010 WL 2787847, at *4 (D. Kan. June 30, 2010); *see* 42 U.S.C. § 406(g) ("As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based." (citing *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 594 (1980))); *Pierce v. Astrue*, No. 1:10-cv-01451-SEB-MJD, 2012 WL 1035020, at *7 (S.D. Ind. Mar. 27, 2012) (remanding the Commissioner's

final decision where certain evidence was referenced by the ALJ in his decision, but was omitted from the administrative transcript submitted to the Court).

Therefore, on this record, the Court concludes that the RFC assigned by the ALJ does not adequately account for Moore's moderate difficulties in both maintaining concentration, persistence, or pace, and maintaining social functioning. Nor did the ALJ confront and resolve the material conflict between the opinions of Dr. Horton and Dr. McDaniel concerning whether Moore can tolerate unlimited interaction with supervisors and coworkers as reflected in the RFC. Accordingly, the Commissioner's final decision will be remanded for the purpose of reassessing Moore's mental RFC on these points.[6]

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Moore and against the Commissioner.

SO ORDERED.

Enter for this 2nd day of September, 2015.

s/ Susan Collins<br>
Susan Collins<br>
United States Magistrate Judge

---

[6] Because a remand is warranted on this basis, the Court need not reach Moore's remaining arguments.